## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ASHLEY ALLEN, | : | CIVIL ACTION NO. 1:22-CV-603 |
| | : | |
| Plaintiff | : | (Judge Conner) |
| | : | |
| v. | : | |
| | : | |
| THE HERSHEY COMPANY, | : | |
| | : | |
| Defendant | : | |

### MEMORANDUM

Plaintiff Ashley Allen brings this suit against her employer, defendant The Hershey Company ("Hershey"), for disability discrimination and retaliation under state and federal law.  Hershey moves to dismiss Allen's amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.  We will grant the motion in part and deny it in part.

### I.    Factual Background & Procedural History

Hershey hired Allen on April 2, 2018, and assigned her to "the position of Production."  (See Doc. 23 ¶ 20).  Allen developed anxiety and depression after her father died in early 2020.  (See id. ¶¶ 22-23).  On March 12 of that year, Hershey "took [Allen] off of the schedule" and referred her to its Employee Assistance Program ("EAP") for counseling.  (See id. ¶¶ 24-25).  Allen returned to work for one day in May 2020, but Hershey "sent her back home on the EAP program" halfway through her shift.  (See id. ¶ 26).  Dr. Gale G. Georgeff, a psychiatrist, examined Allen in June and diagnosed her with generalized anxiety and major depressive disorders.  (See id. ¶ 27).  These medical conditions affected, inter alia, Allen's

concentration, interactions with others, and ability to work.  (See id. ¶ 29).  Allen notified Hershey of her diagnoses and continued taking medical leave through "Short-Term Disability" ("STD").  (See id. ¶ 30).

Hershey hired Corey Hunsinger as a human resource manager around July 2020.  (See id. ¶ 31).  Shortly thereafter, the company terminated Allen's STD payments.  (See id. ¶ 32).  Allen contacted the Leave/Benefits Department about the payment termination, but the Department informed her Human Resources had put an end to her payments.  (See id. ¶¶ 33-34).  Hershey compensated Allen for the balance of her vacation time in October 2020.  (See id. ¶ 35).  The company did not provide a reason for the payout until Allen made multiple inquiries; someone told her she was being placed on "Long[-]Term Disability" ("LTD").  (See id. ¶ 36). Allen spoke with two coworkers who had been on medical leave longer but had not been paid out for vacation time when Hershey placed them on LTD.  (See id. ¶ 37). Neither coworker suffered from Allen's disorders nor required accommodation in the form of medical leave.  (See id. ¶ 38).

Hunsinger sent Allen a letter instructing her to contact him by November 20, 2020, or Hershey would consider her job abandoned and fire her for taking leave without medical documentation.  (See id. ¶ 39).  Allen told Hunsinger she was on leave and in EAP compliance.  (See id. ¶ 42).  Hunsinger asked Allen why she needed medical leave, and Allen replied that, in addition to losing her father, she "also suffered the passing of her brother-in-law and many other family members." (See id. ¶¶ 44-45).  Hunsinger "callously" said Allen's answer was "not a reason for being off of work," to which Allen responded Hershey had removed her from the

schedule.  (See id. ¶¶ 45-46).  Hunsinger told Allen he would look into the matter

and be in touch.  (See id. ¶ 48).  He called her a week later and authorized her to

remain on leave as long as she needed; shortly thereafter, however, per Allen, he

"berate[d]" her with weekly calls, sometimes from his personal cell phone outside of

work, seeking an update on her anticipated return.  (See id. ¶¶ 49-52).

Allen spoke with Dr. Georgeff in January 2021.  (See id. ¶ 53).  She told him

she was afraid for her job and asked him to clear her to return to work.  (See id.)

Dr. Georgeff agreed and wrote her a note authorizing her to return on January 18

"with the reasonable accommodation of working her previous 12-hour shifts with no

overtime."  (See id. ¶ 54).  Allen submitted the note to Hershey; a nurse (presumably

in the company's employ) named Christina told Allen she would call to schedule her

training, but never did.  (See id. ¶¶ 56-57).  Allen called a manager, Debbie Yeagley,

two weeks later and asked about being rescheduled.  (See id. ¶ 58).  Yeagley told

Allen no one was available to train her on either 12-hour shift, so Hershey planned

to put her on an eight-hour shift for several months as general labor.  (See id. ¶ 59).

Yeagley also said Hershey could not accept Dr. Georgeff's note because it restricted

Allen to 14 or 15 shifts per month, even though some months had 16 shifts.  (See id.

¶ 60).

Dr. Georgeff wrote Allen a second note at some point requesting an eight-

hour shift with no overtime.  (See id. ¶ 62).  Allen gave the note to Christina on

February 11, 2021.  (<u>See</u> <u>id.</u> ¶ 63).[1]  Christina told Allen she had spoken with Hunsinger and that Hershey could only accommodate her for two weeks.  (<u>See</u> <u>id.</u> ¶ 64).  When Allen asked why, Christina said she would get back to her.  (<u>See</u> <u>id.</u> ¶ 65).

Allen returned to work the next day.  (<u>See</u> <u>id.</u> ¶ 67).  Hershey's production supervisor, Tim Smith, summoned Allen to his office on February 19 and told her that while Hershey would accommodate her, it would charge her "attendance points" whenever she was called for overtime but could not work due to medical restrictions.  (<u>See</u> <u>id.</u> ¶ 68).  Allen asked to see that policy in writing; Smith showed her pages of a union handbook that allegedly did not comport with what he had told her.  (<u>See</u> <u>id.</u> ¶ 70).  When Allen asked for more information, Smith sent her the absenteeism policy from Hershey's employee handbook.  (<u>See</u> <u>id.</u> ¶ 71).  According to the amended complaint, the absenteeism policy only covered call-offs, not medical restrictions.  (<u>See</u> <u>id.</u> ¶ 72).

Allen was forced to quarantine on April 12, 2021, after her son began exhibiting symptoms of COVID-19.  (<u>See</u> <u>id.</u> ¶ 81).  Hershey instructed Allen to deliver her return-to-work letter as soon as she received it from her healthcare provider.  (<u>See</u> <u>id.</u> ¶ 82).  Hunsinger called her on April 30 to say she would be terminated if she did not return to work.  (<u>See</u> <u>id.</u> ¶ 83).  Allen notified Hunsinger

---

[1] Allen avers she turned over Dr. Georgeff's revised note in February 2022, but this appears to be a typographical error given the chronology of events.  (<u>See</u> Doc. 28 at 4).

she had not yet received the letter; he said she did not need one and she would be fired if she did not return on May 3.  (See id. ¶ 85).  Allen complied.  (See id. ¶ 86).

Hershey eventually began issuing Allen attendance points when she failed to work scheduled overtime shifts.  (See id. ¶ 88).  In October 2021, Carolyn Panetta, a senior human resources manager, gave Allen a "written discipline" based upon her accumulated points.  (See id. ¶ 89).  Panetta informed Allen she would be suspended for one week if she was unable to work overtime again, with termination to follow a second missed shift.  (See id. ¶ 90).  Allen thought it odd Panetta issued the written discipline because that task typically is left to supervisors per Hershey policy.  (See id. ¶ 91).

Allen attempted to access her electronic paystub on the employee portal one day, but she received an error message stating her account had been deactivated and she needed to contact administration.  (See id. ¶ 74).  She discovered she no longer was contributing to her 401(k) account after Hershey's IT Department reinstated her access to the portal.  (See id. ¶ 75).  Allen contacted Vanguard, Hershey's retirement administrator, and learned Hershey had instructed Vanguard to close her account on September 15, 2020, "due to termination/separation of employment."  (See id. ¶ 76).  Hershey never notified Allen of her termination or the closure of her retirement account.  (See id. ¶ 77).  The company denied it had done so.  (See id. ¶ 79).

Allen timely filed a charge with the Equal Employment Opportunity Commission alleging disability discrimination and retaliation.  She received a right-to-sue notice in January 2022 and filed this lawsuit soon thereafter.  Hershey moves

to dismiss the suit under Rule 12(b)(6).  The motion is fully briefed and ripe for disposition.

## II.    <u>Legal Standards</u>

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for the dismissal of complaints that fail to state a claim upon which relief may be granted. <u>See</u> FED. R. CIV. P. 12(b)(6).  When ruling on a motion to dismiss under Rule 12(b)(6), the court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." <u>Phillips v. County of Allegheny</u>, 515 F.3d 224, 233 (3d Cir. 2008) (quoting <u>Pinker v. Roche Holdings, Ltd.</u>, 292 F.3d 361, 374 n.7 (3d Cir. 2002)).  In addition to reviewing the facts contained in the complaint, the court may also consider "exhibits attached to the complaint, matters of public record, [and] undisputedly authentic documents if the complainant's claims are based upon these documents." <u>Mayer v. Belichick</u>, 605 F.3d 223, 230 (3d Cir. 2010) (citing <u>Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.</u>, 998 F.2d 1192, 1196 (3d Cir. 1993)).

Federal notice and pleading rules require the complaint to provide "the defendant fair notice of what the . . . claim is and the grounds upon which it rests." <u>Phillips</u>, 515 F.3d at 232 (alteration in original) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007)).  To test the sufficiency of the complaint, the court conducts a three-step inquiry.  <u>See</u> <u>Santiago v. Warminster Township</u>, 629 F.3d 121, 130-31 (3d Cir. 2010).  In the first step, "the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.'"  <u>Id.</u> at 130 (alteration in original) (quoting

Ashcroft v. Iqbal, 556 U.S. 662, 675 (2009)).  Next, the factual and legal elements of a claim must be separated; well-pleaded facts are accepted as true, while mere legal conclusions may be disregarded.  Id. at 131-32; see Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009).  Once the court isolates the well-pleaded factual allegations, it must determine whether they are sufficient to show a "plausible claim for relief."  Iqbal, 556 U.S. at 679 (citing Twombly, 550 U.S. at 556); Twombly, 550 U.S. at 556.  A claim is facially plausible when the plaintiff pleads facts "that allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Iqbal, 556 U.S. at 678.

## III.    Discussion

Allen alleges Hershey unlawfully punished her for being medically unable to perform overtime work.  She raises claims of disability discrimination (Counts I and II) and retaliation (Counts III and IV) under both the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., and the Pennsylvania Human Relations Act ("PHRA"), 43 PA. STAT. AND CONS. STAT. ANN. § 951 et seq.

The ADA and the PHRA prohibit an employer from discriminating against an employee due to her disability.[2]  See 42 U.S.C. § 12112(a); 43 PA. STAT. AND CONS. STAT. ANN. § 955(a).  Both statutes also forbid retaliating against an employee for engaging in statutorily protected activities, such as requesting or utilizing reasonable work accommodations or medical leave.  See 42 U.S.C. § 12203(a); 43 PA.

---

[2] We review PHRA claims under the same standards as ADA claims.  See Rinehimer v. Cemcolift, Inc., 292 F.3d 375, 382 (3d Cir. 2002) (citing Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir. 1996)).

STAT. AND CONS. STAT. ANN. § 955(d); see also Shellenberger v. Summit Bancorp, Inc., 318 F.3d 183, 188 (3d Cir. 2003); Bearley v. Friendly Ice Cream Corp., 322 F. Supp. 2d 563, 571 (M.D. Pa. 2004). Courts analyze discrimination and retaliation claims under the ADA using the burden-shifting framework outlined in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). The first step of the McDonnell Douglas test requires the plaintiff to establish her *prima facie* case. See McDonnell Douglas, 411 U.S. at 802.

A plaintiff makes out a *prima facie* case of discrimination under the ADA by presenting sufficient evidence that (1) she has a disability within the meaning of the ADA, (2) she was qualified to perform the essential functions of her job, with or without reasonable accommodations, and (3) she suffered an adverse employment action as a result of discrimination. See McGlone v. Phila. Gas Works, 733 F. App'x 606, 609-10 (3d Cir. 2018) (nonprecedential) (citing Gaul v. Lucent Techs., Inc., 134 F.3d 576, 580 (3d Cir. 1998)). Retaliation claims require a similar threshold showing. A plaintiff alleging retaliation under the ADA generally must establish (1) she engaged in a statutorily protected activity, (2) she suffered an adverse employment action, and (3) there was a causal connection between her protected activity and the adverse employment action. See Krouse v. Am. Sterilizer Co., 126 F.3d 494, 500 (3d Cir. 1997); Capps v. Mondelez Global, LLC, 847 F.3d 144, 152 n.6 (3d Cir. 2017) (citing Ross v. Gilhuly, 755 F.3d 185, 193 (3d Cir. 2014)).

Hershey focuses exclusively on the shared "adverse employment action" element. Adverse employment actions are those "serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment."

See Cunningham v. Nordisk, 615 F. App'x 97, 100 (3d Cir. 2015) (nonprecedential) (quoting Storey v. Burns Int'l Sec. Servs., 390 F.3d 760, 764 (3d Cir. 2004)).  In the retaliation context, a plaintiff must plausibly allege that "a reasonable employee would have found the alleged retaliatory actions 'materially adverse' in that they 'well might have dissuaded a reasonable worker from'" exercising their legal rights. See Moore v. City of Philadelphia, 461 F.3d 331, 341 (3d Cir. 2006) (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006)).  The parties identify four potentially adverse actions: (1) the "written discipline" Allen received in October 2021, (2) Hershey's purported termination of Allen's 401(k) account, (3) Hershey's failure to accommodate Allen's request for a work schedule that did not include overtime shifts, and (4) creation of a hostile work environment by company supervisors.  (See Doc. 28 at 8-19; Doc. 29 at 12-21).  Hershey contends these grounds are unavailing because they are not cognizable as a matter of law or Allen did not plead them with sufficient particularity.  (See Doc. 28 at 8-9).  We review each theory *seriatim*.

### A.    Written Discipline

Allen alleges Hershey assessed (and continues to assess) "attendance points" for unmet overtime hours she is incapable of working due to her generalized anxiety and major depressive disorders, and that it did so in retaliation for her requested accommodation of no overtime shifts.  (See, e.g., Doc. 23 ¶¶ 88-89, 92-93). Hershey does not dispute that suspension and termination may result if an employee incurs too many attendance points.  (See id. ¶ 90).  The company rejoins, however, that the "written discipline" Allen received from Panetta in October 2021

for missing mandatory overtime shifts was not discipline at all, but a letter confirming Hershey would accommodate Allen's requests and remove from her record any attendance points she already had received.  (See Doc. 28 at 9).  The company attached to its motion what it says is a copy of the letter.  (See Doc. 27 Ex. B).

Courts generally are limited to considering the complaint's allegations, "exhibits attached to the complaint, matters of public record, [and] undisputedly authentic documents if the complainant's claims are based upon these documents." See Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010) (citing Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993)); see also Schmidt v. Skolas, 770 F.3d 241, 249 (3d Cir. 2014) (explaining courts may consider "document[s] integral to or explicitly relied upon in the complaint") (quoting In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997)).  Although Allen references "a written discipline" Panetta issued in October 2021, (see Doc. 23 ¶ 89), it is not clear that the document attached to Hershey's motion is one and the same.  Allen notes Panetta informed her she might face suspension or termination if she missed one or two more overtime shifts, (see id. ¶ 90), but those consequences do not appear anywhere in the document Hershey proffers, nor has that document been authenticated.  Accordingly, we will not consider it at this time.

Allen's allegations regarding the "written discipline" she received suffice to make out prima facie claims of disability discrimination and retaliation.  Assuming the truth of her averments, Hershey tasked Panetta, a senior human resources manager, with disciplining Allen by warning her she was one missed overtime shift

away from being suspended, and two away from being fired.  (See Doc. 23 ¶¶ 89-90).

Suspensions and firings are quintessential adverse employment actions.  See

Barnees v. Nationwide Mut. Ins. Co., 598 F. App'x 86, 90 (3d Cir. 2015)

(nonprecedential).  By scheduling Allen for overtime shifts after her doctor

explicitly opined she cannot work extra hours due to her disability, and then

disciplining her when she inevitably failed to work those shifts, Hershey has

dangled the threat of lost wages and termination over Allen's head.[3]

What is more, according to Allen, company policy assigns disciplinary

responsibilities to employees' supervisors, but Panetta was not Allen's supervisor.

(See Doc. 23 ¶ 91).  We think a reasonable employee might be dissuaded from

insisting on an unrequited disability accommodation after being warned by a senior

administrator outside their chain of command that serious adverse employment

outcomes would result if they persisted.  See Allen v. Nutrisystem, Inc., No. 11-4107,

2013 WL 1776440, at *6 n.6 (E.D. Pa. Apr. 25, 2013) (holding written warnings issued

inconsistently with employer's disciplinary scheme or that are "part of a

---

[3] These factors differentiate Allen's situation from the facts of Henley
v. Brandywine Hospital, LLC, No. 18-4520, 2019 WL 3326041 (E.D. Pa. July 24, 2019),
a case upon which Hershey heavily relies, (see Doc. 28 at 9-10).  In Henley, the court
dismissed the plaintiff's disability discrimination claims because she failed to allege
any facts establishing that the single written warning she received for habitual
tardiness was part of a progressive disciplinary program, differed from company
policy, or led to further consequences.  See Henley, 2019 WL 3326041, at *11-12.
Allen's amended complaint is not similarly deficient.  She alleges Hershey's
absenteeism policies pertain to call-offs, not medical restrictions, (see ¶¶ 70-72), but
Hershey applied that policy to her despite Dr. Georgeff's notes regarding her
health-related limitations.

progressive disciplinary policy" can constitute adverse employment actions).  Allen

plausibly has alleged Hershey acted with discriminatory and retaliatory motives.

### B.    Termination of Allen's 401(k) Account

Allen next alleges she suffered "economic harm in the form of lost investment

opportunity" when Hershey instructed Vanguard to close her 401(k) account in

September 2020 due to her "termination/separation of employment."  (See Doc. 23

¶¶ 76-78).  Hershey likens Allen's claim to securities litigation.  (See Doc. 28 at 13-

14).  Courts assessing lost opportunity damages in that context consider investment

losses actionable if they are "based on certain, fixed, and demonstrable profits

thwarted by a defendant's alleged fraud."  See Rudinger v. Ins. Data Processing,

Inc., 778 F. Supp. 1334, 1341 (E.D. Pa. 1991); id. at 1340 (calling plaintiff's alleged

losses "calculable," "direct, foreseeable, and specific"); see also Gould v. Am-Haw.

S.S. Co., 535 F.2d 761, 782 (3d Cir. 1976) (discussing general principles of lost

opportunity damages).  Those decisions invariably have held that such losses are

not available when "the fact of the loss, i.e. whether there was any lost opportunity

at all, is wholly speculative."  See In re Daimlerchrysler AG Sec. Litig., 294 F. Supp.

2d 616, 627 (D. Del. 2003) (quoting Tse v. Ventana Med. Sys., Inc., 123 F. Supp. 2d

213, 223 (D. Del. 2000)); see also Rudinger, 778 F. Supp. at 1340 (quoting Gould

v. Am.-Hawaiian S.S. Co., 535 F.2d 761, 781 (3d Cir. 1976)).  Allen does not contest

the applicability of the foregoing principles to lost opportunity damages arising

from employment discrimination; in fact, she cites no case law in response to

Hershey's argument.  (See Doc. 29 at 13-14).  We have not previously confronted this

species of claim, but absent contrary guidance, we find the foregoing precepts

persuasive and will apply them to Allen's complaint.

Allen suggests Hershey "denied access to an aspect of her compensation,"

(see id. at 14), but she fails to plead that Hershey owed her retirement contributions

during the period she was out of work, and she does not even speculate on the

magnitude of the "lost investment opportunity."  Allen also omits relevant dates

from this portion of her amended complaint, so we have no way to determine

whether Hershey "failed to take action to reinstate her account" *after* she returned

to work, as she claims, (see id.), nor can we assess how her portfolio might have

performed *vis-à-vis* the market without at least knowing the period of discontinued

contributions.  Allen's sparse allegations in this regard are "wholly speculative" and

consequently insufficient to establish an adverse employment action.  See *In re*

*Daimlerchrysler*, 294 F. Supp. 2d at 627.  Absent more concrete averments from

which economic harm can be inferred, termination of Allen's 401(k) account cannot

independently form the basis of a discrimination or retaliation claim.  Accordingly,

we will grant Hershey's motion to dismiss this aspect of Allen's complaint, but we

do so with leave to amend because the deficiencies identified herein are factual

rather than legal in nature and therefore are capable of being cured.  See Shane

v. Fauver, 213 F.3d 113, 116 (3d Cir. 2000) (citing, *inter alia*, Dist. Council 47

v. Bradley, 795 F.2d 310, 316 (3d Cir. 1986)).

For reasons explained in Part III.D *infra*, however, the bare fact of her

account's termination, combined with Allen's other allegations, nonetheless may be

enough to establish a hostile work environment irrespective of any pecuniary losses attributable to lapsed retirement contributions.

### C.    Failure to Accommodate

Allen next claims Hershey refused to accommodate her disability.  A plaintiff establishes a *prima facie* case of unlawfully failing to provide a disability accommodation under the ADA by showing (1) she is disabled, and her employer knew of her disability; (2) she requested an accommodation; (3) her employer did not make a good faith effort to accommodate her; and (4) she reasonably could have been accommodated.  See Capps, 847 F.3d at 157.  Hershey argues Allen's continued employment with the company is enough to defeat her claim.  (See Doc. 28 at 16).[4]  Hershey is mistaken.

Allen alleges she notified Hershey of her disability and twice submitted notes from Dr. Georgeff requesting an accommodation of no overtime shifts, (see Doc. 23 ¶¶ 30, 54-55, 62-63), the reasonableness of which Hershey does not contest.  Hershey purportedly rejected the first request out of hand; it granted the second, but only for a two-week period.  (See id. ¶¶ 60-61, 64-66).  According to Allen, company representatives later told her she could take as much leave as she needs, though Hershey would charge her attendance points for doing so.  (See id. ¶¶ 68, 88).  The attendance points Allen accumulated for utilizing her accommodation eventually led to her reprimand in October 2021, when Panetta threatened Allen with suspension

---

[4] Hershey points to the letter attached to its motion as contradictory evidence, (see Doc. 28 at 15), but we will not consider it at this time for reasons previously stated, see *supra* p. 10.

and termination.  (See id. ¶¶ 89-90).  These allegations plausibly support Allen's claim Hershey did not make a good-faith effort to accommodate her disability and retaliated against her when she could not work overtime.  Whether Hershey continues to employ Allen makes no difference to our analysis because she suggests the company's opposition to her requests has not diminished.  (See id. ¶ 92).  Assuming Allen's representations are accurate, her amended complaint adequately alleges an ongoing case of discrimination and retaliation.  Hershey's protestations are unavailing at this stage.

### D.    Hostile Work Environment

Lastly, Allen claims the collective indignities she allegedly suffered at Hershey created a hostile work environment.  To plead a hostile-work-environment claim under the ADA, a plaintiff must allege (1) she is a qualified individual with a disability, (2) she was subject to unwelcome harassment, (3) the harassment was based upon her disability or request for an accommodation, (4) the harassment was sufficiently severe or pervasive to alter the conditions of her employment, creating an abusive work environment, and (5) her employer knew or should have known of the harassment but failed to take prompt remedial action.  See Ballard-Carter v. Vanguard Grp., 703 F. App'x 149, 151-52 & n.17 (3d Cir. 2017) (nonprecedential) (citing Walton v. Mental Health Ass'n of Se. Pa., 168 F.3d 661, 667 (3d Cir. 1999)).  The first four elements establish the existence of a hostile work environment; the fifth determines the basis on which to hold the employer liable.  See Huston v. Procter & Gamble Paper Prods. Corp., 586 F.3d 100, 104 (3d Cir. 2009).  A plaintiff does not need to prove she suffered injury or that her mental health was "seriously

affected"; however, the work environment must be objectively hostile or abusive and the plaintiff must subjectively perceive it that way.  See Walton, 168 F.3d at 667 (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 22 (1993)).

Hershey contends Allen's allegations are not actionable because nothing she cites constitutes harassment, let alone severe or pervasive conduct.  (See Doc. 28 at 12).  *Per contra*, Allen's amended complaint paints a picture of systemic corporate backlash to her exercise of medical leave and pursuit of disability accommodations. Allen alleges that, while she was on leave in late 2020, Hershey terminated her disability benefits, drew down her vacation time, deactivated her access to the employee portal, and instructed Vanguard to close her retirement account.  (See Doc. ¶¶ 32-35, 74-77).  She identifies two other employees whom Hershey treated differently despite taking longer leave; neither employee allegedly suffers from Allen's conditions.  (See id. ¶¶ 37-38).  Allen suggests Hunsinger, Hershey's new human resources manager, threatened to terminate her for job abandonment despite her EAP compliance, "callously" dismissed the deaths of her father, brother-in-law, and other family members that prompted or exacerbated her illness, and "berated" her with weekly status calls.  (See id. ¶¶ 39, 42-46, 50-51). Hunsinger's comments "shocked and appalled" Allen, and she believes his

recurring check-ins were intended to discourage her from exercising her rights under state and federal law.  (See id. ¶¶ 46-47).[5]

Allen avers she so feared for her job that she asked her physician to clear her return.  (See id. ¶ 53).  Her doctor told Hershey she needed reasonable accommodations for her disability, but Allen claims the company refused.  (See id. ¶¶ 54, 60-64).  A direct supervisor later told Allen Hershey would excuse her from overtime shifts with the proviso she would be docked attendance points.  (See id. ¶ 68).  That condition—a poison pill in Allen's view—purportedly finds no support in company policy and arguably undermines the accommodation's purpose by directly tying it to adverse employment consequences, as Allen discovered in October 2021. (See id. ¶¶ 69-73, 88-96).  Allen alleges the conflict between her medical restrictions and Hershey's policies that started nearly three years ago persists and still could result in her termination.  (See id. ¶ 92).  Any reasonable employee in Allen's circumstances would be aggrieved by the prolonged behavior she ascribes to her employer.  Allen has satisfied the objective and subjective hostility prongs of her *prima facie* case, see Walton, 168 F.3d at 667, and, therefore, sufficiently pled Hershey fostered a hostile work environment.

---

[5] Allen indicates Hunsinger separately "harassed, intimidated, and forced [her] to violate" state health guidelines when he overruled previous company instructions and threatened to fire her if she did not prematurely end her COVID-19 quarantine.  (See id. ¶¶ 81-87).

IV.   **<u>Conclusion</u>**

We will grant in part and deny in part Hershey's motion to dismiss.  An

appropriate order shall issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner
United States District Judge
Middle District of Pennsylvania

Dated:     August 23, 2023